**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **Charity Hunt** | : | |
| 230 Rivercrest Dr. | : | |
| Coshocton, Ohio 43812 | : | Case No. |
| | : | |
| **Plaintiff,** | : | Judge: |
| | : | |
| v. | : | Magistrate: |
| | : | |
| **Licking County Sheriff Randy Thorp** | : | |
| **In his Official Capacity** | : | **COMPLAINT WITH JURY DEMAND** |
| 155 E. Main St. | : | **ENDORSED HEREIN** |
| Newark, Ohio 43055 | : | |
| | : | |
| **Defendant.** | : | |

1. This is an action for damages for violations of the Americans with Disabilities Act ("ADA") as amended by the ADA Amendments Act 42 U.S.C.A. §12101 et. seq., Ohio Revised Code §4112 et seq. and the Family Medical Leave Act ("FMLA"), 29 U.S.C. §§2611 et seq.

2. This court has subject-matter jurisdiction over Plaintiff's federal law claims pursuant to 28 U.S.C. §1331 and 29 U.S.C. §2617 and pendent jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367.

3. Defendant Randy Thorp ("Sheriff") is the Sheriff of Licking County, Ohio, and a body politic and corporate capable of suing or being sued.

4. The Sheriff, in his official capacity, is an employer as that term is defined by Title VII of the Federal Civil Rights Act, Ohio law §4112 et seq., and the Family Medical Leave Act.

5. Plaintiff Charity Hunt is an individual residing in Coshocton County, Ohio.

6. From May 14, 2018, until August 25, 2020, Plaintiff was employed by Defendant in the communications department.

7. Plaintiff was originally hired to work as a dispatcher.

8. She served in that capacity for more than one year, receiving favorable reviews for her work.

9. Plaintiff had no disciplinary action and was once chosen as Employee of the Month.

10. In July 2019, a new role was posted internally. The title of the position was Data Entry Specialist.

11. Of the five applicants who interviewed for the role, Plaintiff was chosen.

12. In her new role, she reported to Laura Keene and Lieutenant Dan Loper.

13. As the Data Entry Specialist, she was charged with keeping the LEADS system up to date by entering warrants and protection orders issued by the Licking County Court, including validating those warrants and orders, and removing expired orders. She also entered sexual predator designations and was required to maintain readiness for OSP audits.

14. Throughout her tenure in the Data Entry role, Plaintiff maintained a positive relationship with Court personnel and received favorable feedback regarding her performance.

15. Her new role was a full-time job and a first shift assignment.

16. She worked a unique shift that was different from the dispatchers assigned to the communications department on first shift.

17. Plaintiff is disabled as that term is defined by the ADA and Ohio law. She suffers with Rheumatoid Arthritis. She is treated with Hydroxychloroquine and has a suppressed immune system.

18. Plaintiff is also treated for bi-polar disorder and anxiety.

19. Until the COVID-19 emergency, Plaintiff had no reason to discuss her disabilities with her superiors and had never needed accommodation in order to perform the essential functions of her position.

20. When COVID emerged, Plaintiff experienced increased anxiety because of her pre-existing conditions and her susceptibility to the worst COVID symptoms.

21. On March 24, 2020, she began a conversation with Ms. Keene expressing her stress and requesting accommodation.

22. She asked for an N-95 mask and to limit her exposure to other employees.

23. Plaintiff also suggested that she might need to take FMLA.

24. Keene responded to her request for accommodation by giving her access to the back-entry door of the office and suggesting that she lock her office door while at work. In this way she could limit her contact with other employees.

25. When Plaintiff spoke with Lt. Loper on March 26, 2020, she advised him of her pre-existing RA and expressed her concerns about becoming infected with COVID. Loper also provided her with two N-95 masks.

26. From March 30 until April 2, 2020, Plaintiff took PTO.

27. She consulted with her physician about how she should proceed considering her pre-existing conditions.

28. On April 2, Keene called Plaintiff to inform her of a schedule change.

29. She informed Plaintiff that instead of performing her normal duties on first shift, she would be temporarily assigned to dispatch on third shift.

30. In response to the pandemic and the Governor's stay-at-home orders, the department was reducing staffing in the communications department by implementing so-called "COVID days."

31. All employees would work 32 hours and be paid for 40.

32. On first and second shift, the goal was to have eight or fewer employees working in the radio room at the same time. Third shift was limited to 3 or 4 employees at one time.

33. On April 3, Plaintiff returned to work.

34. Loper affirmed that Plaintiff's re-assignment to third shift was only temporary.

35. Plaintiff was supposed to start her new duties on April 4, but when Loper learned that Plaintiff's daughter had been quarantined, he ordered her off work for two weeks until April 19, 2020.

36. When she returned to work, Plaintiff started her third shift assignment. She was extremely stressed because a new dispatch system had been implemented since she last worked in that role, and she had received no training on the system.

37. On April 21, she spoke with Keene about her status. Plaintiff truthfully told her she was not functioning well due to her health conditions. Keene advised her to "get more sleep."

38. On April 26, Plaintiff asked Keene when she would be allowed to return to her regular shift and her normal duties.

39. Keene told her she did not know.

40. On April 27, Plaintiff emailed Loper, asking for help getting back to her regular job.

41. She informed him that third shift was adversely affecting her medical conditions.

42. Loper offered to switch her to second shift. She agreed, but once on second shift Plaintiff continued to struggle with dispatch duties because it is a much busier shift.

43. Despite her increasing anxiety, she continued working.

44. In early May, Plaintiff noted an announcement on the Comp system that COVID days were due to end on May 14.

45. She texted Keene asking if she would be allowed to return to her normal shift.

46. Keene replied that she should remain on second shift.

47. Every employee in the communications department but Plaintiff returned to their normal shift and duties.

48. Dispatch was fully staffed.

49. Plaintiff asked Sgt. Hufford why she was being treated differently. She asked why she was not able to return to her normal schedule like everyone else.

50. Hufford told her they were waiting for the courts to open back up.

51. The Court continued to issue protection orders and warrants throughout the COVID emergency.

52. Keene had assigned two other employees to do Plaintiff's job while she was assigned to second and third shift.

53. On May 14, 2020, Plaintiff suffered a complete nervous breakdown.

54. She called her psychiatrist who advised that she should take some time off and increase her medication.

55. Plaintiff took vacation and sick time from May 15 through May 25.

56. She began a period of FMLA on May 26 for ten weeks.

57. Upon completing the FMLA application, including the physician's certification, she informed her superiors of her bi-polar disorder.

58. Prior to her scheduled return to work date (August 3, 2020), Keene contacted her to inform her that she would be required to submit a return-to-work certification verifying that she was fit for duty.

59. Her psychiatrist completed the required paperwork and restricted her from performing dispatch duties and from working on third shift.

60. Loper contacted Plaintiff on July 31 to inform her that her restrictions were not acceptable.

61. He told her that she would occasionally be required to perform dispatch duties. He also mentioned call-off coverage and major events.

62. Call-offs in the dispatch department are typically covered by a "hit list." Plaintiff's name never previously appeared on the "hit list."

63. Plaintiff had never previously been called upon to perform dispatch duties during a major event.

64. Plaintiff agreed to speak with her doctor about being released for dispatch duties.

65. On August 3, Plaintiff informed Loper that her doctor would not release her to perform dispatch duties but expressed her desire to return to work.

66. She asked about other positions. Loper agreed to investigate it, but eventually informed her that there was nothing else available for her.

67. Plaintiff's data entry duties were assigned to a first shift dispatcher who spent 8 hours in dispatch and 32 hours performing Plaintiff's data entry duties.

68. On August 5, Plaintiff received a letter from Phyllis Manifold informing her that her FMLA would expire on August 13 and "if we have not received a completed Fitness for Duty form from your treating physician indicating that you are competent to complete all duties of your position without restrictions, you will be unable to return to work at that time."

69. The letter went on to explain that she had the option of applying for additional unpaid leave and temporary disability if she could not return to work with no restrictions.

70. Plaintiff enlisted the help of her union. Unfortunately, the Union was unable to arrange a meeting to discuss Plaintiff's need for accommodation and return to work.

71. After Plaintiff sent several inquiries regarding her employment status, she received a response from Ms. Manifold who reiterated that she could apply for additional unpaid leave to recuperate.

72. Finally, on August 26, Plaintiff received a letter informing her of her termination.

73. The letter erroneously stated that Plaintiff (and her union) failed to communicate with the Sheriff's office after August 18.

74. The Union grieved the termination, and the grievance was denied.

75. Plaintiff filed a civil rights charge with the Equal Employment Opportunity Commission (EEOC) and received a Notice of Right to Sue on July 16, 2021. (Exhibit A).

## COUNT I
## FMLA INTERFERENCE

76. Plaintiff restates and incorporates the foregoing allegations as if fully rewritten herein.

77. On or about May 26, 2020, Plaintiff requested leave pursuant to the FMLA and her request was approved by Defendant.

78. Plaintiff was released to return to work on August 3, 2020 with work restrictions, which included not performing dispatch duties.

79. Plaintiff asked Defendant to accommodate her work restrictions.

80. Defendant refused to allow Plaintiff to return to work with those restrictions in place.

81. Plaintiff asked about other available positions.

82. Loper informed her that there was nothing else available for her.

83. Plaintiff's data entry duties were assigned to a first shift dispatcher who spent 8 hours in dispatch and 32 hours performing Plaintiff's data entry duties.

84. On August 5, Plaintiff received a letter from Phyllis Manifold informing her that her FMLA would expire on August 13 and "if we have not received a completed Fitness for Duty form

7

from your treating physician indicating that you are competent to complete all duties of your position without restrictions, you will be unable to return to work at that time."

85. Plaintiff was unable to obtain a release to return to work without restrictions.

86. On August 26, Plaintiff received a letter informing her of her termination.

87. The Union grieved the termination, and the grievance was denied.

88. By refusing to reinstate Plaintiff upon her release to return to work and by terminating her, Defendant interfered with Plaintiff's FMLA rights.

89. Plaintiff has been damaged by Defendants' interference with her FMLA rights and is entitled to damages therefore, including liquidated damages.

## COUNT II
## DISABILITY DISCRIMINATION
## IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT
## (FAILURE TO ACCOMMODATE AND WRONGFUL TERMINATION)

90. Plaintiff restates and incorporates the foregoing paragraphs as if fully rewritten herein.

91. Defendant is an employer as that term is defined by the ADA.

92. Plaintiff is a qualified individual with a disability as that term is defined by the ADA.

93. Prior to the COVID emergency, Plaintiff performed her data entry duties, full-time, without issue.

94. The data entry role was a competitively bid position.

95. When she accepted the role, Plaintiff's duties and her shift changed.

96. When Plaintiff accepted the role, she was replaced by a newly hired dispatcher.

97. At all times relevant herein, Plaintiff was able to fulfill all the essential functions of her data entry position with or without accommodation.

98. The only time (prior to the COVID emergency) that she was called upon to perform dispatch duties was one time, before she was replaced by a new dispatcher.

99. When she was called upon to perform dispatch duties during the COVID emergency, Plaintiff was informed that it was "temporary," meaning that she would be returned to her former position.

100. While she was on family medical leave, Plaintiff's data entry duties were taken over by a dispatcher who reportedly devoted no less than 32 hours per week to the job.

101. Upon release to return to work, Plaintiff requested accommodations.

102. Her requested accommodation was denied.

103. The only alternative that was offered was to take additional unpaid leave to "recuperate."

104. Plaintiff's disabilities are chronic and will not be cured with time.

105. Defendant's insistence that Plaintiff be released to return to work without restrictions is a violation of the ADA.

106. The department's refusal to offer a viable accommodation is a violation of the ADA.

107. The Defendant's refusal to engage in the interactive accommodation process is a violation of the ADA.

108. When Plaintiff was unable to return to work without restrictions, Defendant terminated her employment.

109. Defendant terminated Plaintiff because of her disabilities and because she needed accommodation.

110. Plaintiff has been damaged by Defendant's violations of the ADA such that she is entitled to damages, therefore.

## COUNT III
## RETALIATION
## IN VIOLATION OF THE ADA

111. Plaintiff restates and incorporates the foregoing allegations as if fully rewritten herein.

112. Defendant is an employer as that term is defined by the ADA.

113. Plaintiff is a qualified individual with a disability as that term is defined by the ADA.

114. Prior to the COVID emergency, Plaintiff performed her data entry duties, full-time, without issue or complaint.

115. At all times relevant herein, Plaintiff was able to fulfill all the essential functions of her data entry position with or without accommodation.

116. Upon release to return to work from leave of absence, Plaintiff requested accommodations that would have allowed her to perform the essential functions of her data entry position.

117. When she requested accommodations, Plaintiff was engaged in protected activity as that term is defined by the ADA.

118. Defendant declined to offer Plaintiff an accommodation that would have allowed her to return to her data entry position.

119. When Plaintiff was unable to return to work without restrictions, Defendant terminated her employment.

120. Defendant terminated Plaintiff in retaliation for her request for accommodation.

121. Plaintiff has been damaged by Defendant's unlawful and retaliatory termination of her employment such that she is entitled to damages, therefore.

**COUNT IV**
**DISABILITY DISCRIMINATION**
**IN VIOLATION OF OHIO REVISED CODE §4112 *et seq.***
**(FAILURE TO ACCOMMODATE AND WRONGFUL TERMINATION)**

122. Plaintiff restates and incorporates the foregoing paragraphs as if fully rewritten herein.

123. Defendant is an employer as that term is defined by Ohio law.

124. Plaintiff is a qualified individual with a disability as that term is defined by Ohio law.

125. Prior to the COVID emergency, Plaintiff performed her data entry duties, full-time, without issue.

126. The data entry role was a competitively bid position.

127. When she accepted the role, Plaintiff's duties and her shift changed.

128. When Plaintiff accepted the role, she was replaced by a newly hired dispatcher.

129. At all times relevant herein, Plaintiff was able to fulfill all the essential functions of her data entry position with or without accommodation.

130. The only time (prior to the COVID emergency) that she was called upon to perform dispatch duties was one time, before she was replaced by a new dispatcher.

131. When she was called upon to perform dispatch duties during the COVID emergency, Plaintiff was informed that it was "temporary," meaning that she would be returned to her former position.

132. While she was on family medical leave, Plaintiff's data entry duties were taken over by a dispatcher who reportedly devoted no less than 32 hours per week to the job.

133. Upon release to return to work, Plaintiff requested accommodations.

134. Her requested accommodation was denied.

135. The only alternative that was offered was to take additional unpaid leave to "recuperate."

136. Plaintiff's disabilities are chronic and will not be cured with time.

137. Defendant's insistence that Plaintiff be released to return to work without restrictions, is a violation of Ohio law.

138. The department's refusal to offer a viable accommodation is a violation of Ohio law.

139. The Defendant's refusal to engage in the interactive accommodation process is a violation of Ohio law.

140. When Plaintiff was unable to return to work without restrictions, Defendant terminated her employment.

141. Defendant terminated Plaintiff because of her disabilities and because she needed accommodation.

142. Plaintiff has been damaged by Defendant's violations of Ohio law such that she is entitled to damages, therefore.

**COUNT V
RETALIATION
IN VIOLATION OF OHIO LAW**

143. Plaintiff restates and incorporates the foregoing allegations as if fully rewritten herein.

144. Defendant is an employer as that term is defined by Ohio law.

145. Plaintiff is a qualified individual with a disability as that term is defined by Ohio law.

146. Prior to the COVID emergency, Plaintiff performed her data entry duties, full-time, without issue or complaint.

147. At all times relevant herein, Plaintiff was able to fulfill all the essential functions of her data entry position with or without accommodation.

148. Upon release to return to work from leave of absence, Plaintiff requested accommodations that would have allowed her to perform the essential functions of her data entry position.

149. When she requested accommodations, Plaintiff was engaged in protected activity as that term is defined by Ohio law.

150. Defendant declined to offer Plaintiff an accommodation that would have allowed her to return to her data entry position.

151. When Plaintiff was unable to return to work without restrictions, Defendant terminated her employment.

152. Defendant terminated Plaintiff in retaliation for her request for accommodation.

153. Plaintiff has been damaged by Defendant's unlawful and retaliatory termination of her employment such that she is entitled to damages, therefore.

### PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully prays that this Court grant her:

a. lost past and future wages and benefits in excess of $75,000;

b. compensatory damages;

c. liquidated damages;

d. an amount in excess of $75,000.00 in compensatory damages for garden variety emotional distress;

e. attorney fees and costs;

f. prejudgment and post judgment interest;

g. such other equitable and further relief as may be just and appropriate.

Respectfully Submitted,
/s/*Sharon Cason-Adams*
Sharon Cason-Adams (0067550)
AGEE CLYMER MITCHELL & PORTMAN
140 East Town St., Suite 1100
Columbus, Ohio 43215
Telephone: 614-221-3318
Facsimile: 614-221-7308
scasonadams@ageeclymer.com

### JURY DEMAND

Plaintiff hereby demands trial by jury on all issues triable before a jury.

/s/*Sharon Cason-Adams*
Sharon Cason-Adams