**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

CHARITY HUNT,

               Plaintiffs,                    **Case No. 2:21-cv-4636**
                                          **JUDGE EDMUND A. SARGUS, JR.**
        **v.**                              **Magistrate Judge Kimberly A. Jolson**

LICKING COUNTY SHERIFF
RANDY THORP,

               Defendant.

## OPINION AND ORDER

This matter is before the Court on Defendant Licking County Sheriff Randy Thorp's ("Sheriff Thorp") Motion for Summary Judgment (ECF No. 22) and Plaintiff Charity Hunt's Motion for Partial Summary Judgment (ECF No. 23). For the following reasons, the Court **GRANTS** Sheriff Thorp's Motion for Summary Judgment (ECF No. 22) and **DENIES** Plaintiff's Motion for Partial Summary Judgment (ECF No. 23).

## I.      BACKGROUND

This employment case arises from Plaintiff's termination from the Licking County Sheriff's Office ("LCSO") following her request for accommodation due to her bipolar disorder. The parties largely agree upon the facts underlying this action.

### A.  Licking County Sheriff's Office, Communications Division

The LCSO is a law enforcement agency overseen by Sheriff Thorp and Colonel Chad Dennis, Sheriff Thorp's second in command, and it is comprised of several divisions, including the Communications Division. (Thorp Dep. 8:21-9:12, ECF No. 19; Loper Dep. 11:6-12, ECF No. 21.) The Communications Division is responsible for providing dispatch services for most law enforcement agencies within Licking County. (Keene Dep. 13:23-27, ECF No. 16.) In 2020, the Communications Division consisted of approximately 24 dispatchers, two supervisors (Sergeant

1

Josh Hufford and Laura Keene), and Lieutenant Dan Loper, to whom Sergeant Hufford and Ms. Keene directly reported. (Loper Dep. 10:18-24; 11:10-12, ECF No. 21.) Above Lieutenant Loper was Captain Darl Evans, who reported to Colonel Dennis. (*Id.* at 10:10-12, 11:1-5.)

Dispatchers, in short, are responsible for answering incoming telephone calls from both the public and law enforcement officers, operating radio consoles and electronic equipment to relay information to law enforcement, and dispatching personnel and cruisers to disturbances, among other duties. (Pl. Dep. Ex. 32, ECF No. 17-2.) Dispatchers also enter warrants, civil protection orders, and other relevant information into the Law Enforcement Automated Data System ("LEADS"). (*Id.*; Thorp Dep. 18:11-14, ECF No. 19.) Ms. Keene, the supervisor for first-shift dispatchers, has primary responsibility for inputting information into LEADS, though she also delegates this data entry work to dispatchers when assistance is needed. (Loper Dep. 23:8-13, ECF No. 21; Keene Dep. 49:16-17, ECF No. 16; Dennis Dep. 27:5-16, ECF No. 18.)

In 2019 and 2020, a collective bargaining agreement between the LCSO and Teamsters Local No. 637 governed the terms and conditions of the dispatchers' employment. (Keene Dep. Ex. 1, ECF No. 16-2.)

**B.  The LCSO and the Communications Division's Response to the COVID-19 Pandemic**

The COVID-19 pandemic drastically impacted employers and their operations throughout the United States and beyond, and the LCSO was no exception. In an effort to promote social distancing, Sheriff Thorp implemented a scheduling change for Communications employees who worked 40 hours per week. (Keene Dep. Ex. 12, ECF No. 16-4.) Beginning on April 4, 2020, all Communications employees would work 32 hours per week but would receive an additional paid day off, referred to as a "COVID day." (*Id.*) Put differently, employees would work 32 hours per week but would be paid as if they worked 40 hours.

Following Sheriff Thorp's announcement, Captain Evans, Lieutenant Loper, and Ms. Keene sought to develop a plan to implement the additional day off while maintaining appropriate staffing levels for all three dispatcher shifts. (Loper Dep. 52:10-53:10, ECF No. 21; Keene Dep. 92:1-9, ECF No. 16.) For context, dispatchers are assigned to one of three shifts: the day shift (7:00 a.m. to 3:00 p.m.), second shift (3:00 p.m. to 11:00 p.m.), and third shift (11:00 p.m. to 7:00 a.m.). (Keene Dep. 27:11-21, ECF No. 16.) When staffing each shift, the LCSO tries to ensure that there are always at least four dispatchers on duty. (*Id.* at 35:6-36:14.) Returning to the implementation of Sheriff Thorp's COVID day schedule, given the required staffing levels, coupled with the required COVID day, Lt. Loper and Ms. Keene identified a resulting vacancy on third shift, which prompted them to move a first-shift employee to third shift. (*Id.* at 90:8-91:21; Loper Dep. 56:13-21, ECF No. 21.) On or about May 14, 2020, Sheriff Thorp ended the COVID day policy. (Pl. Dep. 98:9-12, ECF No. 17.)

### C. Plaintiff's Experience with the LCSO

Plaintiff began her career with the LCSO in May of 2018, when it hired her as a dispatcher. (Pl. Dep. 19:3-9, ECF No. 17.) After working as a dispatcher for over a year, Plaintiff applied for a new role with the LCSO: Patrol-Communications Data Entry Specialist.[1] (*Id.* at 33:13-34:4; Keene Dep. Ex. 5, ECF No. 16-3.) The LCSO posted this position as a transfer opportunity; the position did not come with a pay increase. (*Id.*; Pl. Dep. 42:9-11, ECF No. 17.) The job posting described the new position's duties as follows:

> Under general supervision of Patrol Division and Communications Center supervisory personnel, individuals in this classification are responsible for: answering incoming calls, operating radio console and peripheral electronic equipment to relay information concerning law enforcement and other emergency information. This position's primary responsibility is all LEADS entries,

---

[1] The Court recognizes that the job advertisement refers to this position as a transfer opportunity to "Dispatcher-Data Entry Specialist." (Keene Dep. Ex. 5, ECF No. 16-3.) However, the advertisement also states "Position: Patrol-Communications Data Entry Specialist." (*Id.*) Given this discrepancy, the Court will refer to the position as either "Patrol-Communications Data Entry Specialist" or simply "Data Entry Specialist."

modifications, validations, and removals. This position is responsible for acting as
a liaison with outside agencies and courts concerning LEADS entries.

(Keene Dep. Ex. 5, ECF No. 16-3.)

On August 2, 2019, Plaintiff became the first LCSO Patrol-Communications Data Entry
Specialist. (Pl. Dep. 41:9-15, ECF No. 17.) Following her appointment to this new position, the
LCSO hired a new dispatcher to replace Plaintiff and removed her from the dispatcher schedule.
(*Id.* at 49:7-12; Keene Dep. 82:9-12, ECF No. 16; Loper Dep. 32:3-10, ECF No. 21.)

Once Plaintiff started her new position, dispatchers generally no longer entered warrants
and civil protection orders into LEADS. (Pl. Dep. 55:5-15, ECF No. 17.) This largely became her
responsibility. (Keene Dep. 157:20, ECF No. 16.) From August 2, 2019, until April 2, 2020,
Plaintiff typically spent 8 hours per day entering warrants and protection orders, doing validations,
and other entries associated with her new position. (Keene Dep. 58:23-59:14, 62:15-63:18, ECF
No. 16.)

During her first 8 months as a Data Entry Specialist, Plaintiff performed dispatch duties on
four separate occasions. On one occasion, the LCSO required Plaintiff to fill in for a dispatcher
who needed to leave early; on the other three occasions, Plaintiff performed call-taking duties for
less than a full shift. (Pl. Decl. ¶ 10, ECF No. 27-4.) These instances occurred while the LCSO
was training the dispatcher hired to fill Plaintiff's former dispatcher position. (Pl. Dep. 48:7-49:
12, ECF No. 17.)

### a. The LCSO's response to COVID-19 affected Plaintiff's duties

Plaintiff suffers from Rheumatoid Arthritis and bipolar disorder. (Pl. Decl. ¶¶ 15, 20, ECF
No. 27-4.) When COVID-19 emerged, Plaintiff experienced heightened anxiety because, due to
the medication required to manage her Rheumatoid Arthritis, Plaintiff had a weakened immune
system. (*Id.* ¶ 21.) This, in turn, led Plaintiff to fear that she could contract the most severe COVID-
19 symptoms. (Pl. Dep. 59:12-60:11, ECF No. 17.)

Following Sheriff Thorp's April 2, 2020, announcement concerning the LCSO's implementation of COVID days for the Communications Division, the LCSO temporarily re-assigned Plaintiff to third-shift dispatch. (Pl. Dep. 66:13-67:21, ECF No. 17; Keene Dep. 91:22-92:6, 93:11-94:9, 96:11-14, ECF No. 16.) This ensured that the LCSO would always have four dispatchers on each shift. (Keene Dep. 93:11-94:9, ECF No. 16.)

Upon receiving her re-assignment, Plaintiff became worried. She worried about the switch to third shift because of her medication regime and the importance of maintaining a regular sleep schedule. (Pl. Dep. 67:16-68:3, 84:21-23, ECF No. 17.)

Plaintiff began her new assignment on April 19, 2020. (*Id.* at 74:3-8.) The delay was due to Plaintiff's daughter's exposure to COVID-19, which required Plaintiff to quarantine. (*Id.* at 71:13-74:7.) When Plaintiff began her new assignment, she discovered that there had been changes to the system dispatchers used and that her dispatching skills had become rusty. (Pl. Decl. ¶ 11, ECF No. 27-4.)

Plaintiff struggled on third shift. (Keene Dep. 110:21-111:3, ECF No. 16.) Ultimately, she worked only a few third shifts until she reached out to Ms. Keene, stating that her prescription medication regime made it difficult for her to adjust to her new schedule. (Keene Dep. Ex. 20, ECF No. 16-7.) On April 26, 2020, Plaintiff called off work due to these challenges. (Keene Dep. Ex. 16, ECF No. 16-5.) The following day, Plaintiff emailed Lieutenant Loper. (Keene Dep. Ex. 20, ECF No. 16-7.) In this email, Plaintiff explained that her switch to third shift required her to change her sleep and medication schedules. (*Id.*) She further explained that the transition to third shift was not going well and had exacerbated her health conditions. (*Id.*) Plaintiff then concluded her email with a request to return to her previous shift. (*Id.*)

Lieutenant Loper responded to Plaintiff's email and extended an offer to move Plaintiff to second shift, which Plaintiff accepted. (*Id.*) Plaintiff began working second shift on May 1, 2020.

(Pl. Dep. 96:24-97:7, ECF No. 17.) While working this shift, Plaintiff routinely avoided radio dispatch duties by performing call-taking duties for one of her co-workers. (*Id.* at 94:19-24, 98:2-8.)

**b. Plaintiff requested a return to her pre-pandemic duties**

On or about May 14, 2020, Plaintiff learned that Sheriff Thorp was ending the COVID day policy. (*Id.* at 98:9-12.) This notice prompted Plaintiff to ask Ms. Keene if she could return to her normal schedule. (*Id.* at 98:18-21.) In response, Ms. Keene stated that Plaintiff would remain on second shift "a little while longer." (Keene Dep. Ex. 16, ECF No. 17-5.) When Plaintiff inquired about returning to her previous schedule, the LCSO still needed Plaintiff to remain on second shift performing dispatch duties because of the Communications Division's workload. (Loper Dep. 67:9-19, ECF No. 21; Keene Dep. 119:13-24, 123:22-124:2.) Due to the pandemic, the Licking County Courts, which generate the warrants and protection orders that are entered into LEADS, were not fully operational, reducing the need for data entry work. (Loper Dep. 67:9-19, 70:13-15, ECF No. 21; Keene Dep. 119:13-24, 123:22-124:2.)

**c. Plaintiff took FMLA leave**

On May 15, 2020, the day after Plaintiff learned that she would remain on second shift, Plaintiff notified Sergeant Hufford that she needed two vacation days; she stated that she was under her doctor's care, and her doctor required her not to work until further notice. (Keene Dep. Ex. 16, ECF No. 17-5.) On May 20, 2020, Plaintiff called Ms. Keene and provided an update on her condition:

> Charity called me to advise she is having some stress issues and she has a scheduled phone call appointment with her Doctor in the morning. Charity advised that the Doctor may put her on FMLA. Charity advised she is concerned about "putting the lives of the officers in her hands." Charity requested another vacation day for May 21st. As of today, 05/20/20 Dispatcher Charity Hunt has worked 15 days out of the last 55 days once she was notified that she would be returning to dispatch due to the Covid-19 pandemic.

6

(*Id.*)

On May 26, 2020, Plaintiff submitted her FMLA paperwork to Ms. Manifold, which provided that Plaintiff needed a continuous period of leave from May 15, 2020 through June 22, 2020. (Keene Dep. Ex. 24, ECF No. 17-9.) In an email to Ms. Manifold, Plaintiff explained her need for FMLA leave:

> This episode I'm currently experiencing was triggered by the COVID conditions in the workplace. My psychiatrist said the catalysts were going to third shift during COVID, which interferes with a strict sleep cycle for my condition, and the extreme stress of worrying about contracting COVID because I have a suppressed immune system due to strong rheumatoid arthritis medication, which put me in a high-risk category for COVID.

(*Id.*) And in the FMLA paperwork attached to this email, Plaintiff's doctor indicated that Plaintiff suffered from bipolar disorder, rendering her unable to work during flare-ups. (*Id.*)

Plaintiff was unable to return to work on June 22, 2020, leading to an extension of her leave until July 13, 2020. (*Id.*) Her doctor then extended her leave to August 3, 2020, noting that Plaintiff was about "80% healed but wants her to be 100% before returning to work." (*Id.*)

### d. Plaintiff was unable to return to work without restrictions

On July 28, 2020, Plaintiff submitted a completed fitness for duty packet. (Pl. Dep. 124:17-20, ECF No. 17; Keene Dep. 151:2-20, ECF No. 16.) Due to Plaintiff's bipolar disorder, Plaintiff's physician cleared her for "data entry" work but restricted her from working third shift and performing dispatch duties. (Keene Dep. Ex. 27, ECF No. 16-12.)

Ms. Keene forwarded Plaintiff's fitness for duty packet to Lieutenant Loper, Ms. Manifold, and Captain Evans. (Keene Dep. 153:3-23, ECF No. 16.) Ms. Keene believed, based on the contents of the packet, that Plaintiff was not fit for duty because she could not perform her dispatch duties. (*Id.* at 154:6-21.) Colonel Dennis was of the same belief—that is, Plaintiff would not be fit for duty until her doctor lifted her restrictions. (Loper Dep. 93:9-20, ECF No. 21.) This is because the LCSO still needed Plaintiff to perform dispatch duties upon her return to work. (*Id.* at 1-3;

Loper Decl. ¶¶ 4-5, ECF No. 22-3.) As set forth in Lieutenant Loper and Dreama Cline's affidavits, data entry work remained reduced at that time, and Plaintiff still needed to be able to perform all aspects of dispatch work to assist when emergencies or critical events occurred within Licking County.[2] (Loper Decl. ¶¶ 2-7, ECF No. 22-3; Cline Decl. ¶¶ 10-11, ECF No. 22-2.)

On July 31, 2020, Lieutenant Loper notified Plaintiff that she would not be permitted to return to work until her physician released her to perform dispatch duties:

> [W]e received your fitness for duty packet completed by your doctor advising that you can return to work on Monday 08-03-2020. While reviewing your packet we noticed limitations that would prevent you from performing dispatcher duties. Understand your job duties are dispatcher/data entry specialist. There will be occasions arise that will require you to dispatch or call take. Therefore, you are unable to return to work until you are released by your doctor to perform such duties.

(Keene Dep. Ex. 28, ECF No. 16-13.)

On August 3, 2020, Plaintiff responded to Lieutenant Loper. (Keene Dep. Ex. 29, ECF No. 16-14.) After explaining that she was unable to obtain a release to perform dispatch duties, Plaintiff asked if there were any available positions for which she was qualified:

> I am following up in regards to the letter that was sent to me requesting for my doctor to release me to be able to do Dispatcher duties, I am unable to get a release from her at this time. With that being the situation, I want to return to the sheriff's office to continue my career with the department. With Dispatcher duties being part of my position of Data Entry Specialist I am inquiring as to if there is any other positions that I would quality for within the sheriff's office due to my situation?

(*Id.*) Lieutenant Loper then notified Captain Evans and Colonel Dennis about Plaintiff's request. (Dennis Dep. Ex. 48, ECF No. 18-2; Loper Dep. 88:2-19, ECF No. 21.) In a call with Lieutenant Loper, Plaintiff indicated that she could call-take, though she could not dispatch. (Pl. Dep. 132:7-18, ECF No. 17.) She was advised that the LCSO did not have any vacant positions available for Plaintiff. (Dennis Dep. 96:4-12, ECF No. 18; Loper Dep. 90:2-17, ECF No. 21.) Nor did the LCSO

---

[2] Dreama Cline is currently a Dispatcher with the LCSO, and she has served in that role since April of 2017. (Cline Decl. ¶ 1, ECF No. 22-2.)

have any "light duty" positions. (Thorp Dep. 13:12-13, ECF No. 19 ("That is the standing policy, that there is no light duty.").) Thus, Hunt would not be allowed to return to work unless she could perform dispatch duties. (Dennis Dep. 89:1-2, ECF No. 18 ("If she was not cleared to dispatch, then she could not come back to work.").)

On August 5, 2020, Lieutenant Loper emailed Plaintiff, telling her that the LCSO did not have any vacant positions other than dispatching. (Keene Dep. Ex. 29, ECF No. 16-14.) This email also included a letter from Ms. Manifold notifying Plaintiff that (1) her FMLA leave would expire on August 13, 2020, and (2) if Plaintiff was unable to return to work without restrictions on August 13, 2020, Plaintiff could request a leave of absence without pay pursuant to their collective bargaining agreement. (*Id.*)

On August 17 and August 18, 2020, after the expiration of her FMLA leave, Plaintiff reached out to Ms. Manifold and Colonel Dennis, respectively, regarding her employment status. (Pl. Dep. Exs. 37, 38, ECF Nos. 17-6, 17-7.) Ms. Manifold responded, and she explained that Plaintiff could ask for an unpaid leave of absence and advised Plaintiff to contact her union representative, Greg Ritterbeck. (Pl. Dep. Ex. 38, ECF Nos. 17-7.) Plaintiff then spoke with Mr. Ritterbeck, who directed Plaintiff to give Colonel Dennis an opportunity to schedule a meeting. (Pl. Dep. 147:6-16, ECF No. 17.) Mr. Ritterbeck also advised Plaintiff to submit an application for unemployment compensation. (*Id.* at 147:24-148:7.)

Plaintiff did not have a meeting with Colonel Dennis. (Dennis Dep. 108:15-19, ECF No. 18.) Nor did she request an unpaid leave of absence, explaining:

> I was ready to go back to work and I could do my job. I wanted to go back to work and do my job. And I wasn't going to get better. I had a chronic condition. There was no reason for me to keep continuing to go on unpaid. I could not afford to be unpaid for any longer.

(Pl. Dep. 149:11-19, ECF No. 17 (cleaned up).)

On August 26, 2020, Mr. Ritterbeck emailed Colonel Dennis to schedule a meeting to discuss Plaintiff's disability. (Dennis Dep. 109:5-23, ECF No. 18.) By that time, however, Plaintiff had already filed for unemployment compensation, which led the LCSO to believe that Plaintiff had abandoned her position, thus prompting the LCSO to terminate Plaintiff's employment. (*See id.* at 110:1-11 (responding to Mr. Ritterbeck's meeting inquiry: "Greg, we have attempted several times over the last two weeks to contact [Plaintiff] and have her submit a letter asking for additional time off, but we never received such a request. I was advised that you were going to contact me to set up a meeting or conference, but I never received anything from you regarding this issue until today. In addition, she filed for unemployment and again did not communicate with us regarding her status. Therefore, we had no choice but to terminate her employment with the Licking County Sheriff's Office effective 8/25/2020").) Sheriff Thorp approved Plaintiff's termination. (Thorp Dep. 69:23-70:9, ECF No. 19; Pl. Dep. Ex. 39, ECF No. 17-8.)

## D. COVID's Effects on LEADS Statistics

A review of LEADS statistics reveals a slight decrease in warrants and protection orders following the emergence of COVID-19. For the period of January 1, 2020 through February 28, 2020, the LCSO entered an average of 5.5 warrants per day and 1.6 protection orders per day. (LEADS Statistics, ECF No. 27-3.) From April 15, 2020 through August 3, 2020, the LCSO entered an average of 5.3 warrants per day and 1.5 protection orders. (*Id.*) Colonel Dennis also testified that warrants and field arrests between March and May in 2019 and 2020 were "about the same." (Dennis Dep. 41:20-23, ECF No. 18.)

## E. Procedural History

On September 16, 2021, after receiving a Notice of Right to Sue from the EEOC, Plaintiff filed this action against Sheriff Thorp. (*See* Compl., ECF No. 1.) In her Complaint, Plaintiff alleged the following causes of action: FMLA interference (Count I); failure to accommodate under the

ADA and Ohio Revised Code § 4112 *et seq.* (Counts II and IV, respectively); and retaliation in violation of the ADA and Ohio state law (Count III and V, respectively). (Compl. ¶¶ 76-153, ECF No. 1.)

On December 9, 2022, Sheriff Thorp filed the pending Motion for Summary Judgment. (ECF No. 22.) On that same day, Plaintiff filed her Partial Motion for Summary Judgment. (ECF No. 23.) Plaintiff filed her opposition to Sheriff Thorp's motion (ECF No. 27), to which Sheriff Thorp has replied (ECF No. 29). And Sheriff Thorp filed its opposition to Plaintiff's motion (ECF No. 26), to which Plaintiff has replied (ECF No. 28). These motions are fully briefed and ripe for review.

## II.    MOTIONS FOR SUMMARY JUDGMENT

Before the Court are two motions: Plaintiff's Partial Motion for Summary Judgment and Sheriff Thorp's Motion for Summary Judgment. Plaintiff moves for an order granting her summary judgment on her failure to accommodate claims under the ADA and Ohio state law (Counts II and IV). Sheriff Thorp's motion asks the Court to enter summary judgment in its favor on all of Plaintiff's claims. The Court will begin with Plaintiff's motion.

### A.  Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions" of the record which demonstrate "the absence of a genuine issue of material fact." *Id.* at 323. The burden then shifts to

the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ("The requirement that a dispute be 'genuine' means that there must be more than some metaphysical doubt as to the material facts."). Consequently, the central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234–35 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251–52).

When reviewing cross-motions for summary judgment, as is the case here, the Court "must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994).

### B. Plaintiff's Partial Motion for Summary Judgment

Plaintiff moves for summary judgment on Counts II and IV of her Complaint—that is, Plaintiff asks the Court to enter summary judgment against Sheriff Thorp for failing to accommodate Plaintiff's disability in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and Ohio Revised Code § 4112 *et seq.* In short, Plaintiff argues that there is no genuine dispute of material fact that the LCSO failed to accommodate Plaintiff's disability in violation of the ADA and state law. (Pl. Mot. at 12-20, ECF No. 23.) Plaintiff also argues that the LCSO's requirement that Plaintiff be cleared to work without any restrictions prior to reinstatement is a "100% healed" policy, constituting a per se violation of the ADA. (*Id.* at 1, 14-15, 18-20.)

12

Sheriff Thorp challenges Plaintiff's motion on several grounds. First, Sheriff Thorp argues that Plaintiff's failure to accommodate claims fail as a matter of law. (Def. Opp'n at 13-19, ECF No. 26.) Second, Sheriff Thorp challenges the applicability of Plaintiff's theory premised on the LCSO's purported 100% healed policy, asserting that Plaintiff failed to adequately plead this theory of liability, and even if she did, it still fails as a matter of law. (*Id.* at 8-13.) The Court will begin with Sheriff Thorp's first contention—that Plaintiff's failure to accommodate claims fail a matter of law.

### a. Plaintiff's Failure to Accommodate Claims (Counts II and IV)[3]

Both Plaintiff and Sheriff Thorp have moved for summary judgment on Plaintiff's federal and state failure to accommodate claims. (Def. Mot. at 9-14, ECF No. 22; Pl. Mot. at 12-20, ECF No. 23.) The Court will analyze Plaintiff's federal and state failure to accommodate claims collectively. *See Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1104–05, n.3 (6th Cir. 2008) (considering ADA and Ohio state law claims simultaneously, explaining that "[t]he Ohio Supreme Court has found that because the 'federal Americans with Disabilities Act (ADA) is similar to the Ohio handicap discrimination law, . . . [w]e can look to regulations and cases interpreting the federal Act for guidance in our interpretation of Ohio law.'") (quoting *City of Columbus Civ. Serv. Comm'n v. McGlone*, 697 N.E.2d 204, 206 (Ohio 1998)).

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Falling under the ADA's definition of discrimination is an employer's failure to grant a disabled employee a reasonable

---

[3] Although Plaintiff's Complaint lists "wrongful termination" alongside her failure to accommodate claims, Plaintiff has clarified that these are *not* separate claims. (Pl. Opp'n at 12, ECF No. 27 ("Hunt's disability discrimination claims (failure to accommodate and termination) are not separate claims.").)

accommodation. *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007) (quoting 42 U.S.C. § 12112(b)(5)(A)).

When resolving failure to accommodate claims, courts apply the direct evidence test. *Id.* at 868 ("[C]laims premised upon an employer's failure to offer a reasonable accommodation necessarily involve direct evidence . . . of discrimination."); *see also Brumley v. United Parcel Serv., Inc.*, 909 F.3d 834, 839 (6th Cir. 2018) ("But ADA discrimination 'claims premised upon an employer's failure to offer a reasonable accommodation necessarily involve direct evidence (the failure to accommodate) of discrimination'; the familiar *McDonnell-Douglas* burden-shifting framework . . . therefore does not apply.") (quoting *Kleiber*, 485 F.3d at 868-69). Instead, the Sixth Circuit relies on a multi-part test when assessing failure to accommodate claims:

> (1) The plaintiff bears the burden of establishing that he or she is disabled. (2) The plaintiff bears the burden of establishing that he or she is "otherwise qualified" for the position despite his or her disability: (a) without accommodation from the employer; (b) with an alleged "essential" job requirement eliminated; or (c) with a proposed reasonable accommodation. (3) The employer will bear the burden of proving that a challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship upon the employer.

*Tchankpa v. Ascena Retail Grp., Inc.*, 951 F.3d 805, 811–12 (6th Cir. 2020) (quoting *Kleiber*, 485 F.3d at 869). Upon an employee's request for accommodation, the employer has a duty to engage with the employee in an interactive process. *Hostettler v. College of Wooster*, 895 F.3d 844, 857 (6th Cir. 2018).

The LCSO does not contest that Plaintiff is disabled. Instead, the parties' dispute centers on whether: (1) dispatch duties are an essential function of a Data Entry Specialist (part (2)(b) of the above framework), and (2) whether the LCSO could reasonably accommodate Plaintiff's disability by transferring her to a different position (part (2)(c) of the above framework). Accordingly, to survive summary judgment, Plaintiff carries the burden to submit evidence sufficient to create a genuine issue of material fact regarding whether she is qualified for her

position with dispatching duties eliminated or whether she is qualified for a position with a proposed reasonable accommodation. *See Kleiber*, 485 F.3d at 869.

### i. Qualified Individual

The LCSO contends that Plaintiff is not a "qualified individual" because eliminating dispatch duties from the Data Entry Specialist position would remove an essential function of the position and because Plaintiff's transfer request was unreasonable given that the LCSO did not have any vacant positions for which she was qualified. (Def. Mot. at 10-14, ECF No. 22.) In contrast, Plaintiff argues that her dispatch duties were not essential functions of her position and that her request for an alternative position was reasonable. (Pl. Opp'n at 13-16, ECF No.27.) The Court begins with Sheriff Thorp's first argument—that Plaintiff is not a qualified individual with dispatch duties removed from the Data Entry Specialist position.

### 1. Qualified with dispatch duties eliminated

Are dispatch duties an essential function of Plaintiff's Data Entry Specialist position? Upon careful review of the record and relevant caselaw, the Court holds that they are—though this is by no means an easy decision.

"The inquiry into whether a function is essential is highly fact specific." *Hoskins v. Oakland Cnty. Sheriff's Dep't*, 227 F.3d 719, 726 (6th Cir. 2000). To guide this inquiry, the Sixth Circuit turns to the EEOC's regulations. *See Ford Motor Co.*, 782 F.3d at 761–62. The EEOC regulations direct courts to consider seven factors when undertaking the essential-function inquiry:

i.   The employer's judgment as to which functions are essential;

ii.  Written job descriptions prepared before advertising or interviewing applicants for the job;

iii. The amount of time spent on the job performing the function;

iv.  The consequences of not requiring the incumbent to perform the function;

v.   The terms of a collective bargaining agreement;

vi.    The work experience of past incumbents in the job; and/or

vii.    The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3). The determination of whether a function is essential "should reflect the actual functioning and circumstances of the particular enterprise involved." *Hall v. United States Postal Serv.*, 857 F.2d 1073, 1079 (6th Cir. 1988). Courts, therefore, conduct a case-by-case analysis of the relevant EEOC factors. *See, e.g.*, *Ford Motor Co.*, 782 F.3d at 761–62; *Keith v. County of Oakland*, 703 F.3d 918, 925–26 (6th Cir. 2013).

Here, Plaintiff argues that dispatch duties are not essential functions of the Data Entry Specialist position for several reasons. First, Plaintiff points to the written job description of a Data Entry Specialist, which states that the position's "*primary* responsibility is all LEADS entries, modifications, validations, and removals." (Pl. Mot. at 16, ECF 23 (emphasis added).) Plaintiff acknowledges that the job advertisement included some dispatch duties, but she contends that these duties were marginal functions of the position. In making this argument, Plaintiff cites to the undisputed fact that, between August 3, 2019 and April 3, 2020, she performed dispatch duties on only four occasions—less than 3% of her time. (*Id.*) Outside of those four instances, Plaintiff performed exclusively data entry work.

Plaintiff also asserts that there would be no consequences if the dispatch duties were eliminated from the Data Entry Specialist position. (*Id.* at 16-17.) Plaintiff relies on two instances to support this proposition. First, Plaintiff cites to Lieutenant Loper's testimony stating that, in cases of emergency, such as the Licking County flood, Plaintiff would be needed for dispatch, when in reality, despite Plaintiff being on duty during the flood, the LCSO did *not* require her to perform dispatch duties. (Loper Dep. 104:24-105:19, ECF No. 21.) Second, Plaintiff notes that the LCSO managed to accomplish the COVID day schedule even when Plaintiff quarantined at home for two weeks in April of 2020.

Plaintiff also cites to the LEADS statistics in arguing that the data entry workload only decreased slightly with the onset of COVID-19. (*Id.* at 17 (from "January 1, 2020, through February 28, 2020, LCSO entered an average of 5.5 warrants per day and 1.6 protection orders. From April 15, 2020, through August 3, 2020, the average was 5.3 warrants per day and 1.5 protection orders per day. From March 1, 2021, through April 30, 2021 the numbers were mixed, warrants were down to 4.6 warrants per day, but protection orders were up at 1.9 per day.").)

In response, the LCSO argues—and the Court agrees—that there is no genuine dispute of material fact that dispatch duties are an essential function of the Data Entry Specialist position. (Def. Mot. at 10-11, ECF No. 22; Def. Reply at 2-10, ECF No. 29.) "Essential functions generally are those that the employer's 'judgment' and 'written [job] description' prior to litigation deem essential." *Ford Motor Co.*, 782 F.3d at 761–62 (citing 42 U.S.C. § 12111(8)). As the employer, the LCSO's opinion that dispatch duties are an essential function "carries weight but is only one factor to be considered." *Henschel v. Clare County Rd. Comm'n*, 737 F.3d 1017, 1022 (6th Cir. 2013) (citing 29 C.F.R. 1630.2(n)(3)(i)).

But here, all relevant EEOC factors point to the essential nature of dispatch duties for the Data Entry Specialist position. First, the job description explicitly notes that dispatch duties, while not considered "primary," are nonetheless part of the position's responsibilities: "individuals in this classification are responsible for: answering incoming phone calls, operating radio console and peripheral electronic equipment to relay information concerning law enforcement and other emergency information." (Keene Dep. Ex. 5, ECF No. 16-3.) Moreover, the job advertisement describes the position as a transfer opportunity to "*Dispatcher*-Data Entry Specialist." (*Id.* (emphasis added).)

The LCSO also recognized Plaintiff's dispatch duties as being necessary to the position *prior to litigation*. For example, after receiving Plaintiff's completed fitness for duty packet

17

explaining Plaintiff's work restrictions, Lieutenant Loper specifically noted that, on certain occasions, she would be required to perform dispatch duties. (Keene Dep. Ex. 28, ECF No. 16-13.) The LCSO also reflected the importance of dispatch duties for the Data Entry Specialist during the application process for the position. As stated in Ms. Cline's declaration, a fellow dispatcher who also interviewed for the Data Entry Specialist position, she "was told that the Dispatcher-Data Entry Specialist position's priority and essential job functions would continue to include, first and foremost, dispatching calls." (Cline Decl. ¶¶ 3-4, ECF No. 22-2.) And rightly so; when Plaintiff requested a transfer from third shift to second shift, Lieutenant Loper directed Plaintiff to focus on her dispatch duties. (Keene Dep. Ex. 20, ECF No. 16-7 ("[U]nderstand you are still in the dispatcher classification and due to this pandemic that's where we need you to work. In reference to entering CPO's, Warrants etc. Don't worry about that for the time being.").) Thus, both the LCSO's judgment as to the Data Entry Specialist's essential functions and the written job description prepared before advertising or interviewing applicants weigh in favor of finding dispatch duties an essential function of a Data Entry Specialist. *See* 29 C.F.R. § 1630.2(n)(3)(i)-(ii).

Next, the consequences of not requiring Plaintiff to perform the dispatch duties of her position also weighs in favor of finding such duties essential. *See* 29 C.F.R. § 1630.2(n)(3)(iv). The LCSO cannot predict when emergencies or critical events will arise, necessitating all on-duty dispatchers to perform dispatch duties. (Loper Decl. ¶ 6, ECF No. 22-3; Pl. Dep. 52:6-16, ECF No. 17.) And when an emergency does occur, all employees in the dispatcher classification who are on duty are required to perform dispatch duties; to do otherwise would hinder the LCSO's ability to coordinate its emergency response, which is a core function of the Sheriff's Office. (Loper Decl. ¶¶ 7-8, ECF No. 22-3.) Plaintiff makes much of Lieutenant Loper's Licking County flood example in which Plaintiff did not perform dispatch duties. But Plaintiff's reliance on this

example proves too much. While true that Plaintiff was both on duty during the flood and not required to perform dispatch duties, the record indicates that she *would* have been performing dispatch duties had she not already been assisting Ms. Keene at the old communications center.[4] (Loper Dep. 104:24-105:9, ECF No. 21.) Tellingly, Plaintiff ignores the other example that Lieutenant Loper provided: the high-speed, multi-county pursuit of a semi-truck. (*Id.* at 104:16-23.) During this emergency, Plaintiff *did* perform dispatch duties while serving in her Data Entry Specialist role. (Pl. Dep. 48:23-49:6.)

The fact that emergencies requiring all on-duty dispatchers to perform dispatch duties are few and far between does not cut against the LCSO's position. Indeed, Sixth Circuit precedent holds that, "even if a function is rarely required, the consequences of failing to require the employee to perform that function may illustrate that it is essential." *Swann v. Washtenaw Cnty.*, 221 F. Supp. 3d 936, 942 (E.D. Mich. Nov. 21, 2016) (citing *Brickers v. Cleveland Bd. Of Educ.*, 145 F.3d 846 (6th Cir. 1998)). *Brickers* involved a bus driver suffering from a lower back and leg condition that caused her to seek a transfer from her driver position to that of a bus attendant. *Id.* at 848. After finding that the ability to lift was an essential function of a bus attendant, even if rarely required, the district court granted judgment as a matter of law because the plaintiff was unable to lift weight and an employer need not exempt an employee from performing an essential function to accommodate that employee's disability. *Id.* The Sixth Circuit affirmed the district court's finding, concluding that:

> Although, as [plaintiff] has argued, it may be true that an attendant seldom, if ever, must perform any lifting, the ability to lift would be crucial in an emergency situation, such as an accident or fire. Much like a police officer must have the skill required to use a firearm yet might never actually draw his or her weapon, it only stands to reason that a bus attendant charged with the supervision and care of a group of children with peculiar needs and limitations would be able to account for those needs and limitations in any foreseeable circumstance, regardless of whether that circumstance actually arises. A lifting requirement is one sensible means

---

[4] At the time of the flood, the communications center had recently moved to its new location in Heath, Ohio. (Loper Dep. 38:8-16; 104:24-105:9, ECF No. 21.)

> toward ensuring that a bus attendant will adequately protect his or her charges in
> the event of an emergency, however unlikely.

*Id.* at 849-50. The *Brickers* decision is no outlier. In *Hoskins*, the Sixth Circuit, on summary judgment evidence, rejected a similar argument that rarity makes a function nonessential, explaining "[a]lthough a deputy . . .  may be required physically to restrain inmates only infrequently, the potential for physical confrontation with inmates exists on a daily basis, and the consequence of failing to require a deputy to perform this function when the occasion arises could be a serious threat to security." 227 F.3d at 727. Like *Brickers* and *Hoskins*, even if the LCSO rarely requires a Data Entry Specialist to perform dispatch duties (as was the case prior to COVID-19), the consequences of not requiring Plaintiff to perform this function could very well interfere with the LCSO's response to emergency situations, possibly endangering both law enforcement officers and the public at large.

Just as it may be unlikely a particular officer may ever shoot a gun, the potential for use of a weapon—and the importance of having the skill to use it properly when required—is an essential part of the job. Here, part of the mission of the Sheriff's Office is to handle emergencies, which requires dispatchers to perform dispatch duties. Thus, even if dispatch duties are seldom required of a Data Entry Specialist, the potentially severe consequences of not requiring their performance points to their essentiality.

To be clear, the reason this factor demonstrates that dispatch duties are an essential function of a Data Entry Specialist is because of the severity of the potential consequences if a Data Entry Specialist is unable to perform dispatch duties when required (*i.e.*, jeopardizing the safety of both law enforcement and the public). This nuance matters. For example, in *Orchard v. City of Novi*, the plaintiff (a sign technician) had a 50-pound lifting restriction and the employer argued that being able to lift more than 50 pounds was an essential function of the job. 2022 U.S. Dist. LEXIS 84963, at *6, 19–20 (E.D. Mich. May 11, 2022). In arguing that lifting more than 50 pounds was

nonessential, the plaintiff maintained that he rarely had to lift weight in excess of his lifting restriction. *Id.* at \*19–20. The court, noting that even rarely performed functions may be essential based on the consequences of failing to perform them, held that the facts before it created a genuine dispute of material fact. *Id.* In doing so, the Court distinguished plaintiff's employment from the type of plaintiff in cases such as *Brickers*, in which courts deemed rarely performed functions essential because of the safety concerns associated with their nonperformance. *Id.* at \*20 ("But unlike those cases, no one here voiced a safety concern if Plaintiff could not lift more than fifty pounds while working.") In the present case, Plaintiff's inability to perform dispatch duties does pose a safety concern to both law enforcement and the public—and the potential consequences of Plaintiff's nonperformance are severe.

Turning to the next EEOC factor—the amount of time Plaintiff spent performing dispatch duties—this factor also indicates that such duties are essential. *See* 29 C.F.R. § 1630.2(n)(3)(iii). Although Plaintiff largely performed only data entry work prior to COVID-19, it is undisputed that, following the implementation of COVID days, the LCSO required Plaintiff to perform primarily dispatch duties. But even if the Court were to limit its review exclusively to the period before COVID-19, the fact that Plaintiff only performed dispatch duties on a handful of occasions fails to create a genuine dispute of material fact. As discussed above, the LCSO required Plaintiff to be able to perform dispatch duties when necessary, even in her capacity as a Data Entry Specialist. This requirement ensured that, should an emergency arise, a Data Entry Specialist would be capable of performing dispatch duties to assist in coordinating the LCSO's emergency response.

Finally, the work experience of past or current Data Entry Specialists indicates that dispatch duties are an essential function of Plaintiff's former position. *See* 29 C.F.R. § 1630.2(n)(3)(vi)-(vii). Although Plaintiff was the first (and only) Data Entry Specialist with the

LCSO, the undisputed record establishes that, prior to COVID-19, the position had performed dispatch duties on four occasions, including during one emergency. And following the emergence of COVID-19, along with its attendant effects on the LCSO's data entry workload, the Data Entry position primarily performed dispatch duties. To the extent Plaintiff relies on certain LEADS statistics to suggest that sufficient data entry work persisted after COVID-19 emerged, this is largely irrelevant to the essential-function inquiry. Even assuming the amount of data entry work remained at pre-COVID levels, the LCSO still required a Data Entry Specialist to be able to perform dispatch duties when necessary, such as during an emergency, and the consequences of a Data Entry Specialist's nonperformance of such duties could be grave. Thus, this final factor weighs in favor of finding dispatch duties to be an essential function of a Data Entry Specialist.

In sum, all applicable factors from the EEOC regulations, coupled with binding caselaw, lead the Court to conclude that dispatch duties are an essential function of a Data Entry Specialist— that is, the LCSO's judgment, the Data Entry Specialist's written job description, the consequences of not requiring a Data Entry Specialist to perform dispatch duties, the amount of time Plaintiff spent performing dispatch duties, and the past and current experiences of individuals in the Data Entry Specialist position all illustrate the essential nature of dispatch duties. Accordingly, the Court finds that there is no genuine dispute of material fact that dispatch duties are an essential function of a Data Entry Specialist; therefore, Plaintiff, as a matter of law, is not a qualified individual under the ADA "with an alleged 'essential' job requirement eliminated[.]" *See Tchankpa*, 951 F.3d at 811.

## 2. Qualified with a proposed reasonable accommodation

In the alternative, Plaintiff may show that she is a qualified individual under the ADA "with a proposed reasonable accommodation." *See Tchankpa*, 951 F.3d at 811–12. The proposed accommodation at issue here is Plaintiff's request to be transferred to a vacant position with the LCSO.[5]

The employee bears the burden of proposing a reasonable accommodation. *Tchankpa*, 951 F.3d at 812; *see also Johnson v. Cleveland City Sch. Dist.*, 443 Fed. Appx. 974, 983 (6th Cir. 2011) ("[A]n employee's claim must be dismissed if the employee fails to identify and request such reasonable accommodations."). Chapter 42 U.S.C. § 12111(9)(B) states that a "reasonable accommodation" under the ADA may include "reassignment to a vacant position."[6] But "'an employer need not reassign a disabled employee to a position for which he is not qualified' or 'displace existing employees from their positions . . . in order to accommodate a disabled individual.'" *Swank v. CareSource Mgmt. Group Corp.*, 657 Fed. Appx. 458, 466 (6th Cir. 2016) (quoting *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 457 (6th Cir. 2004)). Notwithstanding an employer's duty under the ADA to consider transferring a disabled employee who can no longer perform her job even with accommodation, the ADA does not require employers "to create new

---

[5] Plaintiff's motion states, without citation to the record, that Plaintiff also asked to be allowed to return to her Data Entry Specialist position with the accommodation that "she be excused from performing dispatch duties." (Pl. Mot. at 18, ECF No. 23.) Assuming that Plaintiff requested this accommodation, which asks to remove an essential function of the Data Entry Specialist position, *see supra* section II.B.a.i.1, such a request is per se unreasonable. *See Ford Motor Co.*, 782 F.3d at 761 ("A 'reasonable accommodation . . . does not include removing an 'essential function[]' from the position, for that is *per se* unreasonable.") (citing *Brickers*, 145 F.3d at 850).

[6] 42 U.S.C. § 12111(9) states that a "'reasonable accommodation' may include: (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." Plaintiff, however, limited her accommodation request to an inquiry into whether the LCSO could reassign her to an alternative position. If Plaintiff believed other accommodations were appropriate, it "was [her] responsibility to make that request." *Green v. BakeMark USA, LLC*, 683 Fed. Appx. 486, 494 (6th Cir. 2017) (citing *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1046 (6th Cir. 1998)). The LCSO "was not required to speculate as to [Plaintiff's] need for an additional accommodation beyond what [Plaintiff] specifically requested in [her August 3] email." *See id.*

jobs[.]" *Kleiber*, 485 F.3d at 869 (citing *Burns v. Coca-Cola Enters., Inc.*, 222 F.3d 247, 257 (6th Cir. 2000)). To overcome summary judgment where the requested accommodation is a job transfer, "the plaintiff generally must identify the specific job he seeks and demonstrate that he is qualified for that position." *Id.* at 870.

Here, Plaintiff requested an alternative assignment in her August 3, 2020, email to Lieutenant Loper:

> I am following up in regards to the letter that was sent to me requesting for my doctor to release me to be able to do Dispatcher duties, I am unable to get a release from her at this time. With that being the situation, I want to return to the sheriffs office to continue my career with the department. **With Dispatcher duties being part of my position of Data Entry Specialist I am inquiring as to if there is any other positions that I would qualify for within the sheriffs office due to my situation?**

(Keene Dep. Ex. 29, ECF No. 16-14 (emphasis added.) Upon receiving Plaintiff's inquiry, Lieutenant Loper notified Captain Evans and Colonel Dennis. (Dennis Dep. Ex. 48, ECF No. 18-2; Loper Dep. 88:2-19, ECF No. 21.) This prompted Lieutenant Loper, Colonel Dennis, and Sheriff Thorp to consider other suitable positions for Plaintiff, but no other positions were available. (Dennis Dep. 96:4-97:2, ECF No. 18; Loper Dep. 90:2-17, ECF No. 21.) And Plaintiff does not suggest otherwise; she has not put forth any evidence identifying the "specific job" she sought as an accommodation nor has she "demonstrated that [she] is qualified" for that unidentified position. *See Kleiber*, 485 F.3d at 870. Accordingly, on the record before the Court, no reasonable jury could conclude that Plaintiff is a qualified individual with a proposed reasonable accommodation. *See Burns*, 222 F.3d at 258 ("Indeed, nearly all the cases that address a plaintiff's ability to recover as a 'qualified individual with a disability' in light of his or her employer's affirmative duty to accommodate conclude that, although employers have a duty to locate suitable positions for disabled employees, such employees may not recover unless they propose, or apply for, particular alternative positions for which they are qualified.").

### ii.  Interactive process

In arguing her failure to accommodate claims, Plaintiff also alleges that the LCSO refused to engage in the interactive process after she requested an accommodation due to her disability. (Pl. Mot. at 18-20, ECF No. 23.) "The duty to engage in the interactive process with a disabled employee is mandatory and 'requires communication and good-faith exploration of possible accommodations.'" *Thompson v. Fresh Prods., LLC*, 985 F.3d 509, 525 (6th Cir. 2021) (quoting *Keith*, 703 F.3d at 929). However, a plaintiff *only* triggers this duty to engage in the interactive process if the plaintiff can establish a prima facie case—that is, this duty arises only if the plaintiff can establish that she is both (a) disabled and (b) otherwise qualified. *Id.* ("In this circuit, failure to engage in the interactive process does not give rise to an independent claim. Instead, it is a violation of the ADA only if the plaintiff establishes a prima facie case of failure to accommodate.") (citing *Rorrer*, 743 F.3d at 1041).

Here, Plaintiff has failed to establish a prima facie case. As discussed in the preceding section, Plaintiff is not a qualified individual within the meaning of the ADA. Given her failure to raise any genuine dispute of material fact on this issue, whether the LCSO engaged in the interactive process is of no moment. *See id.* at 525–26 (declining to reach plaintiff's failure-to-engage-in-the-interactive-process argument where plaintiff did not establish a prima facie case; affirming district court's grant of summary judgment to employer on plaintiff's failure to accommodate claim).

### b.  100% Healed Policy

To prevail on her failure to accommodate claims under an alternative theory, Plaintiff argues that the LCSO maintained a "100% healed policy" constituting a per se violation of the ADA. (Pl. Mot. at 14-15, 18-20, ECF No. 23.) Sheriff Thorp challenges this alternative theory on two grounds: (1) Plaintiff did not adequately plead this theory in her Complaint, and (2) Plaintiff's

theory fails on the merits. (Def. Opp'n at 7-13, ECF No. 26.) The Court finds that, although Plaintiff adequately alleged this theory of liability in her Complaint, she nonetheless cannot prevail on her claim as a matter of law.

### i. Adequacy of Plaintiff's pleadings

For much of a lawsuit's life, the Federal Rules of Civil Procedure "provide for a liberal notice pleading." *Tucker v. Union of Needletrades, Indus., & Textile Emples.*, 407 F.3d 784, 788 (6th Cir. 2005). This liberal pleading standard is appropriate when a lawsuit commences "because 'the provisions for discovery are so flexible' that, by the time a case is ready for summary judgment, 'the gravamen of the dispute [has been] brought frankly into the open for inspection by the court.'" *Id.* (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512-13 (2002)). But once a case has progressed to the summary judgment stage, as is the case here, "the liberal pleading standards under *Swierkiewicz* and [the Federal Rules] are inapplicable." *Id.* (citation omitted).

Replacing the liberal pleading standards is a new inquiry: whether the plaintiff is attempting to expand the claims already alleged. *Bridgeport Music, Inc. v. WB Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007) ("To the extent [a party] seeks to expand its claims to assert new theories, it may not do so in response to summary judgment."). Critical to this inquiry is whether the alleged new or expanded claim causes "unfair surprise" to the defendant. *Tucker*, 407 F.3d at 788.

*Bard v. Brown Cty.*, is instructive. 970 F.3d 738 (6th Cir. 2020). *Bard* arose from the death of a detainee held at the Brown County Jail. *Id.* at 743. The parties disputed the cause of the detainee's death: The defendants maintained that the detainee committed suicide by hanging himself with a bedsheet tied to the sprinkler escutcheon in his cell; the plaintiff's complaint alleged that he "died as a result of homicidal strangulation," later arguing at the summary judgment hearing that defendants staged the hanging. *Id.* at 743, 749. On appeal, the Sixth Circuit assessed whether

the plaintiff's specific theory of the detainee's death "expand[ed] [her] claims[.]" *Id.* at 749 (quoting *Bridgeport*, 508 F.3d at 400). It did not:

> Although [plaintiff] did not develop the specific self-strangulation theory until later, she did not 'seek[] to expand [her] claims' at the summary-judgment stage—the parameters of her § 1983 claim, which focused on the officers' actions inside cell 15 that led to Goldson's death, were the same at summary judgment as they were when she filed her Amended Complaint. . . . [Plaintiff's] articulation of this theory—which did not expand her original § 1983 claim or raise a new one—at the summary-judgment stage thus did not "subject defendants to unfair surprise." *Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 788 (6th Cir. 2005).
>
> In sum, [Plaintiff] raised the specific theory that she raises on appeal at the district-court hearing, and she raised the more general theory of strangulation throughout this litigation. We therefore reject the defendants-appellees' argument that [plaintiff] has waived the self-strangulation theory of Goldson's death.

*Id.* at 750.

Here, Sheriff Thorp's position is that Plaintiff raised—for the first time—the allegation that LCSO maintained an impermissible 100% healed policy in her motion for partial summary judgment. (Def. Opp'n at 8, ECF No. 26.) In making this argument, Sheriff Thorp directs the Court to Plaintiff's Complaint, which does not include any allegations that the LCSO maintained a 100% healed policy constituting a *per se* violation of the ADA. (*Id.*)

In response, Plaintiff argues that, although she does not explicitly mention "policy" in her Complaint, her allegations regarding the LCSO's 100% healed policy are "part and parcel of her failure to accommodate claims." (Pl. Reply at 7, ECF No. 28.) Plaintiff then cites to several paragraphs in her Complaint, including those under Counts II and IV, which she contends speak to the LCSO's violative policy. (*Id.* at 7-8.)

Upon careful review of Plaintiff's Complaint, the Court finds that Plaintiff's theory of recovery premised on the LCSO's so-called 100% healed policy does not impermissibly seek to "expand [her] claims" at the summary-judgment stage. *See Bridgeport*, 508 F.3d at 400. Plaintiff cites to paragraphs 58, 68, 69, 105, 108, 137, and 140 of her Complaint to establish that her failure

to accommodate claims encompassed her claims premised on the LCSO's purported 100% healed policy:

58. Prior to her scheduled return to work date (August 3, 2020), Keene contacted her to inform her that she would be required to submit a return-to-work certification verifying that she was fit for duty.

* * *

68. On August 5, Plaintiff received a letter from Phyllis Manifold informing her that her FMLA would expire on August 13 and "if we have not received a completed Fitness for Duty from your treating physician **indicating that you are competent to complete all duties of your position without restrictions**, you will be unable to return to work at that time."

69. The letter went on to explain that she had the option of applying for additional unpaid leave and temporary disability if she could not return to work with **no restrictions**.

* * *

105. Defendant's insistence that Plaintiff be released to return to work without restrictions is a violation of the ADA.

* * *

108. When Plaintiff was unable to return to work without restrictions, Defendant terminated her employment.

(Pl. Reply at 7-8, ECF No. 28 (Plaintiff's emphasis).)[7]

At the outset, the Court acknowledges that, as Sheriff Thorp also notes, Plaintiff's Complaint does not contain any explicit allegation that the LCSO has a 100% healed policy. But this is not fatal. *See Grinnell v. City of Taylor*, 2022 U.S. App. LEXIS 13540, *14–15 (6th Cir. May 18, 2022) (unpublished) (permitting plaintiff's failure to intervene claim to proceed despite not including the phrase "failure to intervene" in his amended complaint).

When parsing Plaintiff's Complaint, Plaintiff included allegations describing the LCSO's requirement that Plaintiff be "competent to complete all duties of [Plaintiff's] position without

---

[7] Paragraphs 105 and 108 of Plaintiff's Complaint mirror paragraphs 137 and 140, respectively.

restrictions," including the timing of these exchanges and how the LCSO's handling of Plaintiff's restrictions affected Plaintiff's employment. (*See* Compl. ¶¶ 68, 69, 108, ECF No. 1.) Like the plaintiff in *Bard*, Plaintiff is raising a "specific theory" at the summary-judgment stage, which falls within a "more general theory" contained in her complaint—that is, Plaintiff's briefing articulates her specific theory that the LCSO violated the ADA via its so-called 100% healed policy, and this specific theory is encompassed by Plaintiff's more general ADA failure-to-accommodate theory of liability set forth in her Complaint. *See Bard*, 970 F.3d at 750. Thus, a fair reading of Plaintiff's Complaint establishes that her specific policy-based theory is within the parameters of her ADA failure to accommodate claim—in other words, she does not "expand [her] claims" at the summary-judgment stage. *See Bridgeport*, 508 F.3d at 400. And because Plaintiff has not expanded her failure to accommodate claim, Plaintiff does not "subject [Sheriff Thorp] to unfair surprise." *Bard*, 970 F.3d at 750. The Court therefore rejects Sheriff Thorp's contention that Plaintiff failed to plead her failure to accommodate claim premised on the LCSO's purported 100% healed policy.

### ii.  Plaintiff's policy-based claim fails as a matter of law

Plaintiff argues that the LCSO's requirement that Plaintiff be released to perform her job duties without any restrictions—referred to in Plaintiff's moving papers as a 100% healed policy—constitutes a per se violation of the ADA. Under the facts before this Court, the LCSO's so-called 100% healed policy does not violate the ADA.

"A '100% healed' or 'fully healed' policy discriminates against qualified individuals with disabilities because such a policy permits employers to substitute a determination of whether a qualified individual is '100% healed' from their injury for the required individual assessment whether the qualified individual is able to perform the essential functions of his or her job either with or without accommodation." *McGregor v. AMTRAK*, 187 F.3d 1113, 1116 (9th Cir. 1999). The Sixth Circuit has yet to adopt Plaintiff's interpretation that a 100% healed policy is a per se

29

violation of the ADA. *See Henderson v. Ardco, Inc.*, 247 F.3d 645, 653–54 (6th Cir. 2001) (explaining that employer's enforcement of 100% healed policy may be permissible where plaintiff could not perform the essential job functions of any job at the employer's plant). Instead, Plaintiff directs the Court to decisions outside the Sixth Circuit, inviting this Court to follow in the footsteps of other circuits. (Pl. Reply at 15-16, ECF No. 28.)

The Court declines to extend the boundaries of ADA liability beyond those already constructed by the Sixth Circuit. But even if the Court were to adopt Plaintiff's approach, the mere existence of a 100% healed policy, standing alone, is not sufficient for Plaintiff to prevail on her claim. She must first be a qualified individual with a disability within the meaning of the ADA— and she is not. *See, e.g.*, *Beckman v. Wal-Mart Stores, Inc.*, 739 Fed. Appx. 800, 804 (6th Cir. June 27, 2018) (finding the question of whether Wal-Mart had a 100% healed policy "immaterial" after holding that the employee was not a "qualified individual" under the ADA); *Hohider v. United Parcel Service*, 574 F.3d 169, 194–96 (3rd Cir. 2009) (holding that a 100% healed policy violates the ADA if it has the effect of discriminating against *an otherwise qualified individual with a disability*); *McGregor*, 187 F.3d at 1116 ("A '100% healed' or 'fully healed' policy discriminates against *qualified individuals with disabilities* because such a policy permits employers to substitute a determination of whether a qualified individual is '100% healed' from their injury for the required individual assessment whether the qualified individual is able to perform the essential functions of his or her job either with or without accommodation.") (emphasis added); *Gardenhire v. Manville*, 722 Fed. Appx. 835, 840 (10th Cir. 2018) (noting that the employer's purported 100% healed policy had "no bearing on [employee's] ADA claim," where there was no genuine dispute that the employee could not perform the essential functions of his job with or without a reasonable accommodation).[8] Thus, unless Plaintiff is both an individual with a disability and otherwise

---

[8] *See also Employer-Provided Leave and the Americans with Disabilities Act*, U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION (May 9, 2016), https://www.eeoc.gov/laws/guidance/employer-provided-leave-and-

qualified as defined in the ADA, then the LCSO's purported 100% healed policy does not give rise to a per se violation of the ADA. *See Beckman*, 739 Fed. Appx. at 804.

As discussed above, Plaintiff has not shown a triable issue as to whether she is a qualified individual under the ADA. Thus, "the question of whether [the LCSO] had a so-called '100% policy' is immaterial to [Plaintiff's] ADA claims." *See id.* at 804.

All told, the Court finds that Sheriff Thorp has shown there is no genuine dispute as to any material fact that Plaintiff is not a qualified individual under the ADA. Plaintiff cannot prevail on her failure to accommodate claims unless she is a qualified individual—and she is not. The Court therefore **DENIES** Plaintiff's Partial Motion for Summary Judgment and **GRANTS** Sheriff Thorp's Motion for Summary Judgment as to Counts II and IV of the Complaint.

### C. Sheriff Thorp's Motion for Summary Judgment

The Court now turns to Sheriff Thorp's Motion for Summary Judgment, which asks the Court to enter judgment in its favor on all of Plaintiff's claims. As previously held in Section B of this Opinion and Order, Plaintiff's disability discrimination claims (Counts II and IV) fail as a matter of law because she is not a qualified individual with a disability. Plaintiff's remaining claims for FMLA interference and retaliation under the ADA and state law similarly fail as a matter of law.

#### a. FMLA Interference

Plaintiff cannot prevail on her FMLA interference claim largely for one of the same reasons that she cannot prevail on her disability claims—she was unable to perform the essential functions

---

americans-disabilities-act (last visited Apr. 24, 2023) ("An employer will violate the ADA if it requires an employee with a disability to have no medical restrictions -- that is, be "100%" healed or recovered -- *if the employee can perform her job with or without reasonable accommodation* unless the employer can show providing the needed accommodations would cause an undue hardship.") (emphasis added). While the EEOC's guidance does not engender deference, "they 'are entitled to respect' under our decision in *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 . . . (1940), but only to the extent that those interpretations have the 'power to persuade[.]'" *EEOC v. Sundance Rehab. Corp.*, 466 F.3d 490, 500 (6th Cir. 2006) (quoting *Christensen v. Harris County*, 529 U.S. 576, 587 (2000)).

of a Data Entry Specialist. To prevail on an FMLA interference claim, Plaintiff must establish that: (1) she is an eligible employee; (2) the LCSO is an employer under the statute; (3) Plaintiff was entitled to leave under the FMLA; (4) Plaintiff gave notice of her intention to take leave; and (5) the LCSO denied the FMLA benefits to which she was entitled. *See Wysong v. Dow Chem. Co.*, 503 F.3d 441, 447 (6th Cir. 2007). An employee returning from FMLA leave is generally entitled to reinstatement to her previous position or an equivalent position. 29 U.S.C. § 2614(a)(1). "If, however, the employee remains unable to perform an 'essential function' of her position upon returning from leave, she has no right to reinstatement under the FMLA." *Garcia v. Renaissance Global Logistics, LLC*, 2010 U.S. Dist. LEXIS 134952, at *10 (E.D. Mich. Dec. 21, 2010) (citing *Edgar v. JAC Prods.*, 443 F.3d 501, 507 (6th Cir. 2006)).

Here, the parties only contest the last element—whether the LCSO denied Plaintiff the FMLA benefits to which she was entitled. The Court's resolution of Plaintiff's failure to accommodate claims, however, also resolves Plaintiff's FMLA interference claim. Plaintiff rests her FMLA interference claim on the Court finding that Plaintiff's ability to perform the essential functions of a Data Entry Specialist is a question of fact reserved for the jury. (Pl. Opp'n at 17-18, ECF No. 27.) But it is not. Upon the end of Plaintiff's FMLA leave, she was not released to perform her position's essential functions. Thus, the LCSO did not deny Plaintiff any benefits to which she was otherwise entitled. *See Cehrs v. Northeast Ohio Alzheimer's Research Ctr.*, 155 F.3d at 784–85 (6th Cir. 1998) (finding no FMLA violation because the evidence was undisputed that the employee was unable to return to work by the statutory deadline). The Court therefore **GRANTS** Sheriff Thorp's Motion for Summary Judgment on Plaintiff's FMLA interference claim (Count I).

### b.  Retaliation under the ADA

Sheriff Thorp also moves for summary judgment on Plaintiff's ADA retaliation claim (Count III). (Def. Mot. at 18-19, ECF No. 22.) Sheriff Thorp contends that Plaintiff's retaliation claim fails as a matter of law because: (1) it is procedurally deficient—namely, Plaintiff failed to exhaust her administrative remedies prior to bringing this claim; and (2) the claim fails on the merits. The Court begins with Sheriff Thorp's procedural argument.

### i.  Exhaustion requirement

Generally, a plaintiff may not bring ADA claims in federal court without first exhausting her administrative remedies on those claims by including them in a charge filed with the EEOC. *See Parry v. Mohawk Motors of Mich., Inc.*, 236 F.3d 299, 309 (6th Cir. 2000). This exhaustion requirement "gives notice to the alleged wrongdoer of its potential liability and enables the EEOC to initiate conciliation procedures in an attempt to avoid litigation." *Dixon v. Ashcroft*, 392 F.3d 212, 217 (6th Cir. 2004).

Here, Sheriff Thorp argues that Plaintiff's retaliation claim is procedurally deficient because Plaintiff did not include retaliation claims in her EEOC charge. In making this argument, Sheriff Thorp directs the Court's attention to Plaintiff's EEOC charge, which indicates that Plaintiff based her discrimination charge solely on "disability," not retaliation. (*See* EEOC Charge, ECF No. 27-2.)  In response, Plaintiff argues that her failure to check the box indicating that her discrimination charge also involves retaliation is not determinative. Instead, Plaintiff argues that the critical inquiry is whether the particulars listed in her charge allege sufficient facts to place the EEOC on notice of her retaliation claims, and that her EEOC charge did so. The Court agrees with Plaintiff.

The Sixth Circuit applies the "expected scope of investigation test" in situations where a plaintiff has filed a charge with the EEOC but later brings suit on an additional uncharged claim. *See Dixon*, 392 F.3d at 217. The *Dixon* court explained this test as follows:

> In *Weigel v. Baptist Hosp. of East Tennessee*, 302 F.3d 367 (6th Cir. 2002), we reiterated, "the general rule in this circuit . . . that the judicial complaint must be limited to the scope of the EEOC investigation reasonably expected to grow out of the charge of discrimination." *Id.* at 380 (internal citation omitted); *see also Bray v. Palm Beach Co.*, 907 F.2d 150, 1990 WL 92672, at *2 (6th Cir. 1990) (finding "the facts alleged in the body of the EEOC charge, rather than merely the boxes that are marked on the charge, are the major determinants of the scope of the charge"). We explained in *Weigel* that, "pursuant to this rule, we have recognized that 'where facts related with respect to the charged claim would prompt the EEOC to investigate a different, uncharged claim, the plaintiff is not precluded from bringing suit on that claim.'" 302 F.3d at 380 (quoting *Davis*, 157 F.3d at 463). This principle became known as the "expected scope of investigation test." *Weigel*, 302 F.3d at 380.
>
> The determinative inquiry in this case, therefore, is whether Dixon alleged sufficient facts in his EEOC Complaint to put the EEOC on notice of his retaliation claim, despite that he did not check the appropriate box on the EEOC's Complaint of Discrimination form.

*Id.*

Here, Plaintiff "alleged sufficient facts in [her] EEOC Complaint to put the EEOC on notice of [her] retaliation claim[s]," despite having failed to check the appropriate box on the EEOC's Charge of Discrimination form. *See id.* Plaintiff's EEOC charge alleges the following facts, in pertinent part:

- My psychiatrist completed the paperwork and restricted me from performing dispatch duties and from working 3rd shift.

- Loper contacted me to inform me that my restrictions would not be accepted because I was expected to "occasionally" perform dispatch duties.

- I informed Loper that my doctor would not release me to perform dispatch duties but expressed my desire to return to the data entry job I had been doing for nearly a year.

- I asked my employer to accommodate my restrictions.

- Because I could not provide a release that allowed me to perform dispatch duties, I was terminated from my position on August 25, 2020.

34

(EEOC Charge, ECF No. 27-2.)

Applying the expected scope of investigation test to this case, the Court finds that these facts would prompt the EEOC to investigate Plaintiff's uncharged retaliation claim. Plaintiff's charge informed the EEOC that (1) Plaintiff requested an accommodation, (2) the LCSO did not provide an accommodation, and (3) the LCSO subsequently terminated Plaintiff because she was not released to perform a duty that she was only expected to perform occasionally. These facts paint a picture in which Plaintiff could reasonably be a victim of retaliation. The Court therefore finds that Plaintiff has exhausted her administrative remedies on her retaliation claims despite her failure to check the "retaliation" box on her EEOC charge.

### ii. Retaliation

The Court now turns to the merits of Plaintiff's ADA retaliation claim. To establish a prima facie case of retaliation under the ADA, the plaintiff must show that: "(1) the plaintiff engaged in activity protected under the ADA; (2) the employer knew of that activity; (3) the employer took an adverse action against plaintiff; and (4) there was a causal connection between the protected activity and the adverse action." *Rorrer*, 743 F.3d at 1046. At the prima facie stage, the plaintiff's burden "is minimal." *Wyatt*, 999 F.3d at 419. "Once a plaintiff establishes a prima facie case, 'the defendant has a burden of *production* to articulate a nondiscriminatory reason for its action. If the defendant meets its burden, the plaintiff must prove the given reason is pretext for retaliation.'" *Id.* (quoting *Ford Motor Co.*, 782 F.3d at 767).

Plaintiff asserts that the LCSO terminated her in retaliation for requesting a reasonable accommodation that would have allowed her to return to work following her FMLA leave. (Pl. Opp'n at 18-19, ECF No. 27.) In arguing that she has established a prima facie case of ADA retaliation, Plaintiff points to the language of her final communication with Colonel Dennis and the temporal proximity of that email to her termination. Sheriff Thorp, on the other hand, asserts

that Plaintiff cannot establish a prima facie case, and even if she could, Sheriff Thorp has sufficiently demonstrated that the LCSO had a nondiscriminatory reason for its action. (Def. Mot. at 15-16, 18-19, ECF No. 22.)

Sheriff Thorp challenges Plaintiff's prima facie case by arguing that she cannot establish a causal connection between Plaintiff's request for accommodation and her subsequent termination. More precisely, Sheriff Thorp argues that there is no evidence that the LCSO terminated Plaintiff because of her accommodation request; instead, the LCSO terminated Plaintiff after receiving notice of her request for unemployment compensation coupled with her failure to request an unpaid leave of absence despite having directed Plaintiff to request such leave on multiple occasions. The Court agrees.

"To establish a causal connection, a plaintiff must proffer evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action." *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007) (quotation marks omitted). Stated differently, the plaintiff must produce sufficient evidence to establish that she only suffered adverse employment action because of the protected activity. *Nguyen v. City of Cleveland*, 229 F.3d 559 (6th Cir. 2000)).

Temporal proximity between the protected activity and the adverse employment may be sufficient to demonstrate causation. *See Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525–26 (6th Cir. 2008) (finding temporal proximity sufficient to establish causation when the employer fired the employee the same day that the employer learned of the employee's EEOC charge). "[W]here an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." *Goree v. UPS*, 2017 U.S. App. LEXIS 22596, *9–10 (6th Cir. Nov. 8, 2017) (quoting *Mickey*, 516 F.3d at 525). "But where some time elapses between when the employer learns of a protected

36

activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Id.* at 10 (quoting *Mickey*, 516 F.3d at 525). Thus, "unless immediate, temporal proximity must be 'coupled with other indicia of retaliatory conduct' to give rise to a causal inference." *McCoy v. Mv Residential Prop. Mgt., Inc.*, 2:14-cv-2642, 2016 U.S. Dist. LEXIS 47733, at *21 (S.D. Ohio Apr. 8, 2016) (citing *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 588–89, 595 (6th Cir. 2009)).

This Court's decision in *Merendo v. Ohio Gastroenterology Grp., Inc.* is instructive. 2019 U.S. Dist. LEXIS 31507 (S.D. Ohio 2019). In *Merendo*, the undersigned required the plaintiff to show other evidence of retaliatory conduct even though the employer learned that she had engaged in protected activity nine days before her termination. *Id.* at *58.

Here, Plaintiff contends that a seven-day gap separates her protected activity (her August 18, 2020 email to Colonel Dennis requesting accommodation) from the adverse employment action (her termination). But this mischaracterizes the undisputed facts. Plaintiff first requested an accommodation for her disability on August 3, 2020, when she emailed Lieutenant Loper requesting a transfer to another position for which she was qualified. This occurred more than *three weeks* prior to her August 25, 2020, termination. Given this gap—far more than the nine days in *Merendo*, which this Court held were still insufficient to establish causation standing alone—Plaintiff must provide "other evidence of retaliatory conduct." *See Mickey*, 516 F.3d at 525. But she does not. (*See* Pl. Opp'n at 20, ECF No. 27 (providing only "the language of Hunt's final communication with Colonel Dennis and the temporal proximity of that email to her termination" as evidence demonstrating causation).) Thus, Plaintiff cannot establish a prima facie case of retaliation.

But even if the Court were to conclude that Plaintiff has presented a prima facie case of retaliation, Sheriff Thorp is still entitled to summary judgment. As set forth above, once Plaintiff

establishes her prima facie case, the burden shifts to Sheriff Thorp to present a nondiscriminatory reason for terminating Plaintiff. *See Wyatt*, 999 F.3d at 419. In line with its burden of production, Sheriff Thorp has articulated a nondiscriminatory reason for terminating Plaintiff: the LCSO terminated Plaintiff after informing her multiple times to request an unpaid leave of absence, she failed to request an unpaid leave of absence, and then she filed an unemployment compensation claim, causing the LCSO to believe Plaintiff abandoned her position. (Dennis Dep. 102:22-103:6, 111:2-9, ECF No. 18; *see also* Pl. Dep. Ex. 39, ECF No. 17-8 (August 25, 2020, termination letter citing Plaintiff's failure to request unpaid leave, as requested, and the LCSO's receipt of Plaintiff's unemployment compensation application as grounds for Plaintiff's termination).)

Because Sheriff Thorp has met his burden of production, the burden returns to Plaintiff to demonstrate that Sheriff Thorp's offered reason is pretextual. *See Wyatt*, 999 F.3d at 419. Plaintiff's often show pretext in one of the following ways: "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that the proffered reasons were insufficient to motivate the employer's action." *Miles v. South Cent. Human Res. Agency, Inc.*, 946 F.3d 883, 888 (6th Cir. 2020) (citation omitted). Plaintiffs may, however, show pretext in other ways; indeed, "these three categories are simply a 'convenient way of marshaling evidence and focusing it on the ultimate inquiry: did the employer fire the employee for the stated reason or not?'" *Id.* (quoting *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012)). Although a plaintiff has some flexibility in how she carries this burden, she still "must articulate some cognizable explanation of how the evidence she has put forth establishes pretext." *Id.*

Here, Plaintiff fails to carry her burden. The evidence undercuts the argument that the LCSO's proffered reason had no basis in fact, did not actually motivate its actions, or was insufficient to motivate its actions. The LCSO provides two reasons that, collectively, led to

Plaintiff's termination: (1) after being informed on several occasions to request an unpaid leave of absence, Plaintiff failed to do so; and (2) the LCSO believed Plaintiff had abandoned her position upon receiving her unemployment compensation application. The undisputed record supports each reason. The LCSO notified Plaintiff on August 18 and August 19, 2020, that she needed to request additional unpaid leave in order to maintain employment. (Pl. Dep. Ex. 39, ECF No. 17-8.) Plaintiff did not request unpaid leave. (Pl. Dep. 146:19-22, ECF No. 17.) And the LCSO believed Plaintiff had abandoned her position after it received notice of her unemployment compensation claim. (Dennis Dep. 102:22-103:6, 111:2-9, ECF No. 18; Pl. Dep. Ex. 39, ECF No. 17-8.) To the extent Plaintiff asserts that these reasons do not have a basis in fact, she "must provide evidence that the employer's allegations never happened." *Miles v. South Cent. Human Res. Agency, Inc.*, 946 F.3d 883, 889 (6th Cir. 2020). But Plaintiff does not—nor can she, given the uncontested record. Nor does Plaintiff provide evidence indicating that the LCSO's stated reasons did not actually motivate its actions or were insufficient to motivate its actions. What the record does show is the presence of a considered decision to terminate Plaintiff based on a nondiscriminatory, nonretaliatory business reason, and no reasonable jury could find pretext. In other words, Plaintiff does not create a genuine dispute as to whether the LCSO would have retained Plaintiff had she not exercised rights under the ADA. The Court therefore **GRANTS** Sheriff Thorp's Motion for Summary Judgment on Plaintiff's ADA retaliation claim (Count III).

### c.  Retaliation under Ohio Rev. Code § 4112

Sheriff Thorp also moves for summary judgment on Plaintiff's state law retaliation claim. (Def. Mot. at 19-20, ECF No. 22). The Defendant argues that it is entitled to summary judgment on Plaintiff's retaliation claim because: (1) requesting an accommodation is not "protected activity" under the applicable state statute, and (2) even if requesting an accommodation constitutes protected activity, Plaintiff's claim fails for the same reasons that her ADA retaliation

claim fails. (*Id.*) The Court need not resolve Sheriff Thorp's first argument—that is, even assuming Plaintiff's request for an accommodation is protected under Ohio Rev. Code § 4112, Plaintiff's claim still fails because she cannot establish a causal connection between her accommodation request and her termination, and even if she could, the LCSO had a nondiscriminatory reason for terminating her employment.[9]

The federal standard for a retaliation claim governs a retaliation claim brought under Ohio state law. *Paynter v. Licking Mem. Health Sys.*, 2007 U.S. Dist. LEXIS 71930, at *5 (S.D. Ohio Sept. 27, 2007) (citing *Galey v. May Dep't Stores Co.*, 9 F. App'x 295, 298–99 (6th Cir. 2001)). Thus, under Ohio Rev. Code § 4112.02(I), a prima facie case of retaliation requires a plaintiff to demonstrate: (1) the plaintiff engaged in activity protected by § 4112; (2) the defendant knew of the plaintiff's exercise of their protected rights; (3) the defendant subsequently took an adverse employment action against the plaintiff or subjected the plaintiff to severe or pervasive retaliatory harassment; and, (4) there was a causal connection between the plaintiff's protected activity and

---

[9] Regarding Sheriff Thorp's first argument—that an accommodation request is not protected activity under Ohio Rev. Code § 4112—there exists a split among Ohio's appellate courts on this interpretation, though the courts that have mor extensively addressed the issue support Sheriff Thorp's position. Upon review of the relevant caselaw, it appears that the Eighth District first adjudicated the issue, holding that an employee's request for a reasonable accommodation was protected activity. *Johnson v. Cleveland City Sch. Dist.*, 2011-Ohio-2778, ¶ 68 (Ohio Ct. App. 2011). In reaching this conclusion, the Eighth District did not analyze the text of Section 4112, nor did it provide any supporting authority. *See id.*

The Sixth District addressed this issue next, and it declined to follow in *Johnson's* footsteps. *See Musil v. Gerken Materials, Inc.*, 2020-Ohio-3548, ¶ 20 (Ohio Ct. App. 2020). In *Musil*, the Sixth District interpreted the relevant statute, R.C. 4112.02(I), which states that it is unlawful to discriminate against a person because that person has "opposed any unlawful discriminatory practice," or "made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing." Ohio Rev. Code. § 4112.02(I). The Sixth District then noted that the appellant's request for an accommodation "was not participation in an investigation, proceeding, or hearing," nor was it "opposition to an unlawful discriminatory practice"; "Indeed, the act of terminating a person for requesting a reasonable accommodation would be the discriminatory practice itself." *Musil*, 2020-Ohio-3548, ¶ 20. Thus, the Sixth District held that an employee's "request for accommodation was not protected activity under R.C. 4112.02(I)." *Id.*

The Third District confronted this issue as well, but with the added benefit of sailing in already-charted waters. *See Hall v. Crawford Cnty. Job & Family Servs.*, 2022-Ohio-1358, ¶¶ 34–35 (Ohio Ct. App. 2020). After reviewing both *Johnson* and *Musil*, the Third District held, based on *Musil's* reasoning (and the absence of any analysis in *Johnson*), that an employee's "request for accommodation is not protected activity under R.C. 4112.02(I)." *Id.* ¶ 35.

The most recent decision that the Court could find on this issue belongs to the Eighth District, which held that requesting an accommodation for a disability is protected activity. *Ferguson v. Univ. Hosps. Health Sys.*, 2022-Ohio-3133, ¶ 120 (Ohio Ct. App.) (citing *Johnson*, 2011-Ohio-2778, ¶ 68).

the adverse employment action. *Arnold v. Speedway*, LLC, 2021 U.S. Dist. LEXIS 225543, *13-14 (S.D. Ohio Nov. 23, 2021); *see also Greer-Burger v. Temesi*, 879 N.E.2d 174, 180 (Ohio 2007).

Plaintiff's retaliation claim under Ohio law fails for the same reasons as his ADA retaliation claim. Plaintiff has failed to present any material evidence demonstrating that her termination had a causal connection to her request for accommodation. And even if she did present such evidence, the LCSO had a nondiscriminatory reason for terminating Plaintiff. Therefore, Sheriff Thorp's Motion for Summary Judgment is **GRANTED** on Plaintiff's state law retaliation claim (Count V).

### III.    CONCLUSION

For the reasons stated herein, the Court **GRANTS** Sheriff Thorp's Motion for Summary Judgment (ECF No. 22) and **DENIES** Plaintiff's Motion for Partial Summary Judgment (ECF No. 23). The Clerk is directed to **ENTER JUDGMENT** in favor of Sheriff Thorp and close this case.

**IT IS SO ORDERED.**

<u>4/27/2023</u>                              <u>s/Edmund A. Sargus, Jr.</u>
DATE                              EDMUND A. SARGUS, JR.
                              UNITED STATES DISTRICT JUDGE